IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

```
IN RE                                  )
                                       )
TRAVIS BENTON JOHNSON and              )    Case No. 07-51275
AMY TURTLE JOHNSON,                    )
                                       )
                    Debtors.           )
_____)
```

## MEMORANDUM OPINION DENYING CONFIRMATION OF CHAPTER 13 PLAN

This matter came before the Court on November 20, 2007 upon the Notice and Proposed Order of Confirmation (the "Plan"), filed by Travis and Amy Johnson (the "Debtors") on October 26, 2007; the Objection to Confirmation or Reclassification of Debt (the "Objection"), filed by Christy C. Snow ("Mrs. Snow") on November 14, 2007; and the Response to Objection to Order Confirming Plan by Christy C. Snow (the "Response"), filed by the Debtors on November 19, 2007.  Thomas W. Anderson  appeared on behalf of the Debtors, A. Carl Penney appeared on behalf of Ms. Snow, and Vernon J. Cahoon appeared on behalf of the Chapter 13 Trustee (the "Trustee").  After consideration of the Plan, the Objection, the Response, the evidence presented at the hearing, the arguments of the parties, and the relevant law, the Court will sustain the Objection and deny confirmation of the Plan.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984.  This is a core

1

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L) which this Court has the jurisdiction to hear and determine.

## II.  FACTS

The male Debtor ("Mr. Johnson") and Mrs. Snow were married on December 7, 2001. One child, Meagan Johnson, was born to the marriage.  On November 23, 2005,  Mr. Johnson and Mrs. Snow entered into a Separation Agreement (the "Separation Agreement").  The Separation Agreement was drafted by Mr. Johnson's divorce attorney and was revised on at least three occasions prior to entry.  Paragraph one releases Mr. Johnson "from any and all obligations for alimony and support" of Mrs. Snow.  Paragraphs three and four of the Separation Agreement provide that Mr. Johnson will pay for the support and medical insurance coverage of Meagan Johnson.  Paragraph five provides that Mr. Johnson and Mrs. Snow will equally share the costs of a college education for Meagan Johnson.  Paragraph nineteen of the Separation Agreement provides that Mr. Johnson and Mrs. Snow will purchase life insurance policies and designate Meagan Johnson as the beneficiary.

Mr. Johnson and Mrs. Snow owned real property located at 121 Cedar Bluff Trail, Dobson, North Carolina (the "Real Property") as tenants by the entirety.   Pursuant to paragraph six of the Separation Agreement, Mr. Johnson agreed to convey his undivided, one half interest in the Real Property to Mrs. Snow.  Two deeds of trust encumber the Real Property.  The first deed of trust is in favor of Piedmont Federal Savings and Loan Association ("Piedmont"), and it secures a debt in the original principal amount of $56,000.00.   Mrs. Snow agreed to assume sole responsibility for payment of the debt secured by the Piedmont deed of trust.

The second deed of trust is in favor of Wachovia Bank and Trust Company

("Wachovia"); it secures a line of credit with an outstanding balance, as of the signing of the Separation Agreement, of $22,000.00 (the "Wachovia Debt"). The Wachovia Debt was incurred to purchase personal property items for Mr. Johnson, Mrs. Snow, Meagan Johnson, and their household.[1] During the marriage, Mr. Johnson and Mrs. Snow made payments on the interest portion of the Wachovia Debt. Because Mrs. Snow could not afford to pay both deeds of trust on the Real Property, Mr. Johnson agreed to assume sole responsibility for payment of the Wachovia Debt.[2] Meagan Johnson was accustomed to living in the residence, and both Mr. Johnson and Mrs. Snow wanted her to remain living there. Mr. Johnson was aware that Mrs. Snow intended to remain in the residence with Meagan Johnson after the separation and divorce. At the time that the parties entered into the Separation Agreement, there was roughly $30,000.00 of equity in the Real Property.[3]

---

[1]The money was used to purchase, among other items, a 1994 Chevy diesel truck, another pick-up truck, a camper, and an ATV. The money was also used to pay off an outstanding loan on a minivan. The Chevy truck was traded in for a 2000 Ford F-150, which was sold after the divorce was final. The camper was sold and a portion of the proceeds were applied to the debt secured by the Wachovia Deed of Trust. Mrs. Snow currently has possession of the ATV.

[2]Paragraph 6 of the Separation Agreement provides, in relevant part, as follows:

> Upon conveyance of the property by the husband to wife, the husband agrees to pay any and all indebtedness due Wachovia Bank against said real estate, and the husband agrees to pay said Wachovia Bank debt in full no later than when the above-mentioned Piedmont Federal deed of trust is paid in full. The husband will save harmless and indemnify the wife from the payment of any and all of the indebtedness due Wachovia Bank on said real property. The parties agree to execute the necessary documents to close the provisions of the line of credit and freeze the account whereby no additional sums may be advanced.

[3]The tax value of the Real Property when the Separation Agreement was signed was approximately $101,000.

On September 18, 2006, a divorce judgment was entered in state court, terminating the marriage of Mr. Johnson and Mrs. Snow and incorporating the Separation Agreement.  Mr. Johnson married the female Debtor in November of 2006.  Mrs. Snow remarried in the spring of 2007.

Mr. Johnson made payments on the Wachovia Debt from September of 2005 through August of 2007.  On August 16, 2007, the Debtors filed jointly for Chapter 13 bankruptcy relief.  On October 4, 2007, Mrs. Snow filed a proof of claim totaling $22,283.47, which represents the principal balance of the Wachovia Debt as of the petition date.  On October 26, 2007, the Plan was filed; it provides for a plan payment of $505.00 each month for 60 months.  The Plan proposes no payments on the Wachovia Debt.

On their Schedule E, the Debtors checked the box stating that there were domestic support obligations owing.  Mrs. Snow is listed as an unsecured, nonpriority creditor on Schedule F.  Schedule F lists the Wachovia Debt as "domestic support obligations arising from separation agreement and divorce judgment."  Wachovia Bank is also listed as an unsecured, nonpriority creditor for the "second deed of trust on property conveyed to former spouse."  On Schedule H, Mrs. Snow is listed as a co-debtor on the Wachovia Debt.

On November 14, 2007, Mrs. Snow filed the Objection.  Mrs. Snow argues that confirmation should be denied and that the balance owed on the Wachovia Debt is a nondischargeable domestic support obligation pursuant to Section 523(a)(5) of the Bankruptcy Code.  On November 19, 2007, the Response was filed.  The Debtors agree that Mr. Johnson has ongoing obligations pursuant to paragraphs three, four, and five of the Separation Agreement.  Further, the Debtors agree that such obligations are priority, nondischargeable obligations

pursuant to Sections 507(a)(1) and 523(a)(5) of the Bankruptcy Code. However, the Debtors assert that paragraph six of the Separation Agreement, which addresses the Real Property, provides for a property settlement, not a nondischargeable domestic support obligation ("DSO") pursuant to Section 523(a)(5). Mr. Johnson contends that he did not intend for the assumption of the Wachovia Debt to be for alimony or child support. He admitted that he wanted to provide for Meagan Johnson, and that he was willing to do anything to secure a divorce.

The issue before the Court is whether the portion of the Separation Agreement pertaining to the Wachovia Debt constitutes a nondischargeable DSO or a dischargeable property settlement.

### III.  DISCUSSION

**A.     The Statute**

Section 523 of the Bankruptcy Code specifies that certain debts are nondischargeable in a bankruptcy case. The pertinent portions of Section 523, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), specify:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
> . . .
> (5) for a domestic support obligation;
> . . .
> (15) to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a government unit; . . .

BAPCPA added the term "domestic support obligation" ("DSO") to the Code. Section 101(14A) provides that a DSO is:

> a debt that accrues before, on, or after the date of the order of relief in a case

5

>under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is -
>>(A) owed to or recoverable by -
>>>(I) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>>>(ii) a governmental unit;
>>(B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
>>© established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of -
>>>(I) a separation agreement, divorce decree, or property settlement agreement;
>>>(ii) an order of a court of record; or
>>>(iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
>>(D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A) (2005).

Sections 523(a)(5) and (15) operate to provide greater protection for alimony, maintenance, and support obligations owing to a spouse, former spouse, or child of a debtor in bankruptcy. Alan N. Resnick, 2007 Collier Pamphlet Edition Bankruptcy Code 42-43, 590 (Alan N. Resnick & Henry J. Sommer eds., Matthew Bender & Company, Inc. 2007) (1981). "[A] debtor should not use the protection of a bankruptcy filing in order to avoid legitimate marital and child support obligations." Id. (quoting 140 Cong. Rec. H 10,769 (October 4, 1994)). These provisions are intended to make "non-dischargeable any debts resulting from an agreement by the debtor to hold the debtor's spouse harmless on joint debts, to the extent that the agreement is in payment of alimony, maintenance, or support of the spouse, as determined under

bankruptcy law considerations as to whether a particular agreement to pay money to a spouse is actually alimony or a property settlement." S. Rep. No. 95-989, at 79 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5865.

**B. Determination of Domestic Support Obligation**

In cases under Chapters 7, 11, and 12 of the Bankruptcy Code, the distinctions between DSOs, governed by Section 523(a)(5), and other types of post-marital obligations, governed by Section 523(a)(15), are immaterial because both types of debts are nondischargeable and must be paid in full. In re Douglas, 369 B.R. 462, 465 (Bankr. E.D. Ark. 2007); see 4 Collier on Bankruptcy ¶ 523.02 at 523-15-16. But in Chapter 13 cases, an important distinction is drawn. DSOs may not be discharged in a Chapter 13 plan. 11 U.S.C. § 1328(a)(2); 11 U.S.C. § 523(a)(5). However, other post-marital obligations, including property settlements, are nondischargeable in Chapter 13. 11 U.S.C. § 1328(a)(2); 11 U.S.C. § 523(a)(15); Douglas, 369 B.R. at 465. If an obligation is deemed a DSO, pursuant to Section 523(a)(5), then the obligation is a priority debt, pursuant to Section 507(a)(1)(A), and the Chapter 13 plan must provide for its full payment, pursuant to Section 1322(a)(2). See, e.g., In re Taylor, No. 07-31055, slip op. at 4 (Bankr. E.D. Va. Apr. 26, 2007) (2007 WL 1234932). In fact, the discharge will not be granted until the DSO has been paid in full pursuant to Section 1328(a). In re Sanders, 347 B.R. 776, 780 (N.D. Ala. 2006). Therefore, the Court must determine whether Mr. Johnson's obligation to pay the Wachovia Debt is a DSO under Section 523(a)(5).

For the Wachovia Debt to be considered a DSO, the Court must determine that the obligation (1) is owed to or recoverable by Mrs. Snow; (2) is in the nature of alimony, maintenance, or support; (3) was established before the debtor filed for bankruptcy relief by a

separation agreement or divorce decree; and (4) has not been assigned other than for collection purposes. 11 U.S.C. § 101(14A)(B); see also In re O'Brien, 339 B.R. 529, 531(Bankr. D. Mass. 2006).

Payment of the support, maintenance, or alimony need not be paid directly to the spouse or ex-spouse. In re Calhoun, 715 F.2d 1103, 1107 (6th Cir.1983); see In re Spong, 661 F.2d 6, 10-11 (2d Cir. 1981). The Wachovia Debt is owed by Mr. Johnson and Mrs. Snow to Wachovia. The debt would be recoverable from Mrs. Snow or Mr. Johnson if Mr. Johnson did not pay. Due to the language in the Separation Agreement by which Mr. Johnson agreed to hold her harmless, if Mrs. Snow were forced to pay the Wachovia Debt, then Mr. Johnson would be liable to Mrs. Snow. Thus, the Wachovia Debt is owed to or recoverable by Mrs. Snow.

The Wachovia Debt was established pursuant to a Separation Agreement entered on November 23, 2006, which is prior in time to the Debtors' Chapter 13 bankruptcy. The Wachovia Debt has not been assigned to any other entity.

The final prong of the DSO analysis requires the Court to determine whether the payment of the Wachovia Debt is in the nature of alimony, maintenance, or support, which is a fact specific analysis. In re Austin, 271 B.R. 97, 106 (Bankr. E.D. Va. 2001); In re Baker, 274 B.R. 176, 188 (Bankr. D.S.C. 2000); In re Catron, 164 B.R. 912, 918-19 (E.D. Va. 1994), aff'd, 43 F.3d 1465 (4th Cir. 1994). The complaining spouse has the burden to demonstrate that the obligation at issue is in the nature of alimony, maintenance or support. Grogan v. Garner, 498 U.S. 279, 287 (1991); In re Omine, 485 F.3d 1305, 1320 (11th Cir. 2007) (stating the burdened party needs to show that the parties intended the obligation as support); Tilley v. Jessee, 789 F.2d 1074, 1077 (4th Cir. 1986).

8

Federal bankruptcy law, not state law, determines whether a debt is in the nature of support. In the Matter of Long, 794 F.2d 928 (4th Cir. 1986); In re Hudson, No. 06-81745, slip op. at 2 (Bankr. C.D. Ill. Nov. 27, 2007) (2007 WL 4219421); In re Adams, 254 B.R. 857, 861 (D. Md. 2000); see also In re Strickland, 90 F.3d 444, 446 (11th Cir. 1996) (a debt may be in the "nature of support" even though it would not legally qualify as support under state law); In re Yeates, 807 F.2d 874 (10th Cir. 1986) (same). The court must not rely only on the label used by the parties or the state court, but must look beyond the label to examine whether the debt actually is in the nature of support or alimony. Cummings v. Cummings, 244 F.3d 1263, 1265 (11th Cir. 2001); In re Brody, 3 F.3d 35, 38 (2d Cir. 1993).

DSO is a term derived from the definition of a nondischargeable debt for alimony, maintenance, and support contained in the former Section 523(a)(5); therefore, case law construing the former Section 523(a)(5) is relevant and persuasive. Hudson, slip op. at 2; In re Lepley, No.07-20344, slip op. at 3 (Bankr. W.D. Mo. Sept. 6, 2007) (2007 WL 2669128); In re Knox, No. 07-11082, slip op. at 2 (Bankr. E.D. Tenn. May 23, 2007) (2007 WL 1541957); see In the Matter of Dankert, No. 07-40109, slip op. at 3 (Bankr. D. Neb. Sept. 27, 2007) (stating that BAPCPA did not change the standard for whether an obligation is in the nature of support).

In the Fourth Circuit, courts first look at the mutual or shared intent of the parties to create a support obligation. Tilley, 789 F.2d at 1078 (stating that intent is the threshold that must be crossed before any other concerns become relevant); see In re Yeates, 807 F.2d 874, 878 (10th Cir. 1986); Long v. Calhoun (In re Calhoun), 715 F.2d 1103, 1109-10 (6th Cir. 1983) (showing that the initial inquiry is to determine whether there was intent to create support). The court should look at the parties' intent at the time of the divorce or separation. E.g., Brody, 3

9

F.3d at 38; Tilley, 789 F.2d at 1077; Shaver v. Shaver, 736 F.2d 1314, 1316 (9th Cir. 1984). The labels attached to certain provisions in a separation agreement are not dispositve of their "nature," but the labels are persuasive evidence of the parties' intent. Tilley, 789 F.2d at 1077-78 (a label in the agreement erects a "substantial obstacle" for the party seeking to overcome it); Catron, 43 F.3d at 2.

Courts in the Fourth Circuit have articulated an "unofficial" test for the intent inquiry, which provides for the court to look at: (1) the actual substance and language of the agreement, (2) the financial situation of the parties at the time of the agreement, (3) the function served by the obligation at the time of the agreement (i.e. daily necessities), and (4) whether there is any evidence of overbearing at the time of the agreement that should cause the court to question the intent of a spouse. Catron, 164 B.R. at 919 (citing Kettner v. Kettner, No. 91-587-N, 1991 WL 549386 (E.D. Va. Nov. 19, 1991)) (the Fourth Circuit noted that approval of the use of these factors did not preclude the use of other formulae). Furthermore, because this list is non-exclusive and the inquiry is fact intensive, courts should consider all relevant evidence. Lepley, No.07-20344, slip op. at 4.[4] Ultimately, courts may look beyond the four corners of a divorce decree or the agreement of the parties to determine the nature of the payments constituting the debts sought to be discharged. In re Cribb, 34 B.R. 862, 864 (Bankr. D.S.C. 1983); see also In re

---

[4]Other courts have stated factors such as: (1) the respective employment histories and prospects for financial support, (2) the fact that one party or another receives the marital property, (3) the periodic nature of the payments, (4) whether it would be difficult for the former spouse and children to subsist without the payments, (5) the length of the marriage, (6) the economic disparity of the parties, (7) whether there are minor children in the care of the complaining spouse, (8) age, employability, and education levels of the parties, (9) the label in the decree or agreement, and (10) whether the payment is contingent upon events such as death or remarriage. In re Gianakas, 917 F.2d 759, 762 & n.1 (3rd Cir. 1990); Lepley, No.07-20344, slip op. at 4; In re Tatge, 212 B.R. 604, 608 (B.A.P. 8th Cir. 1997).

Bristow, No. 04-50235, slip op. at 3 (Bankr. M.D.N.C. April 22, 2005) (2005 WL 1321996).

Numerous courts have held that an obligation that is essential to enable a party to maintain basic necessities or to protect a residence constitutes a nondischargeable support obligation.  See, e.g., Tatge, 212 B.R. at 608 (agreement to make mortgage payments was intended to serve most basic of support functions, to provide a home that plaintiff otherwise would not have been able to afford); Bristow, No. 04-50235, slip op. at 5-6 (agreement to pay an equity line debt in equitable distribution judgment was obligation necessary for support, as evidence supported finding that ex-wife was unable to meet basic household needs if debtor did not pay); In re Batzek, 314 B.R. 464, 468 (Bankr. M.D. Fla 2004) (debtor's obligation to pay second mortgage was nondischargeable as being in nature of support); In re Azia, 159 B.R. 71, 74 (Bankr. D. Mass. 1993) (obligation to pay second mortgage on marital residence, which was conveyed to ex- wife, and to hold ex-wife harmless, fell within exception pursuant to Section 523(a)(5) because it was one which enabled debtor's ex-wife and their children to maintain shelter); In re Cacolici, 108 B.R. 578, 584 (Bankr. N.D. Ohio 1989) (debtor's divorce decree obligation was nondischargeable support even when termed "property settlement" because the assets awarded to former spouse were necessary for her support); but see Lepley, No.07-20344, slip op. at 5-6 (court found that obligation to pay ex-wife $150 per week after termination of child support was not a DSO by looking at the terms and purpose of the agreement and found instead that it was a property settlement).  On nearly identical facts to those in this case, the Gianakas court held that an obligation to make payments on a second mortgage was in the nature of support and therefore nondischargeable.  Gianakas, 917 F.2d at 764.  The court reasoned that at the time of the divorce the parties intended the ex-spouse to remain in the former marital home

11

with the couple's children. Id. The court looked at the nature of the obligation at the time that it was undertaken, regardless of the parties' current financial situation. The court ruled that the agreement to provide shelter should be construed as an obligation to provide support. Id. at 763.

Further, an agreement to indemnify and hold an ex-spouse harmless on a debt is nondischargeable for the same reasons that an obligation to enable a family to maintain shelter is nondischargeable. Azia, 159 B.R. at 74. In Calhoun, 715 F.2d at 1107, the court noted that where hold harmless clauses relate to debts in the nature of alimony or support "[b]ankruptcy courts have uniformly found hold harmless clauses to create nondischargeable obligations." The hold harmless agreement imposes liability upon the assuming spouse for all consequences of failure to pay. Azia, 159 B.R. at 75; Robinson v. Robinson (In re Robinson), 921 F.2d 252, 253 (10th Cir.1990) (affirming lower court's order that debtor maintain second mortgage payments and hold his former spouse harmless for the debt, finding that the obligation was in the nature of alimony or support).

What was the mutual intent of Mrs. Snow and Mr. Johnson at the time of entering into the Separation Agreement? They both knew that Mrs. Snow would be unable to afford to remain living on the Real Property with Meagan Johnson unless Mr. Johnson assumed the Wachovia Debt. Mr. Johnson testified that he was willing to do whatever it took to get out of the marriage. The Court finds that at the time of the Separation Agreement the parties intended Mr. Johnson's payment of the Wachovia Debt to serve as a contribution toward maintenance and support of lodging for Ms. Snow and Meagan Johnson.

The Separation Agreement did not designate the obligation to pay the Wachovia Debt as support. In fact, the Separation Agreement did not label any obligation as support. Nor did it

label any obligation as being a part of the property settlement.  No provision in the agreement was labeled.  But the agreement to pay the Wachovia Debt was essential to protect the former marital residence, and Mr. Johnson agreed to indemnify and hold Ms. Snow harmless on the debt.  As discussed above, an obligation that enables one's family to maintain shelter is in the nature of support, and an agreement to indemnify and hold the former spouse harmless on that debt is nondischargeable under Section 523(a)(5).

All of the circumstances taken together, including the intent of the parties, the financial circumstances of the parties at the time of entering into the Separation Agreement, and the function served by Mr. Johnson paying the Wachovia Debt, justify a finding that the obligation of Mr. Johnson to pay the Wachovia Debt is a DSO.  The obligation to pay the Wachovia Debt is "in the nature of alimony, maintenance, or support," and therefore constitutes a DSO that must be paid in full under the Debtors' Plan**.**

## IV.  CONCLUSION

The obligation of Mr. Johnson to pay the Wachovia Debt constitutes a DSO pursuant to Section 523(a)(5) of the Bankruptcy Code.  As such, the debt is nondischargeable and must be paid in full under the Debtors' Plan.  Confirmation of the Plan will be denied, and the Objection will be sustained.  The Debtors shall be given the opportunity to file a new plan in compliance with this opinion.

This opinion constitutes the Court's findings of fact and conclusions of law.  A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION**

| | |
|---|---|
| IN RE ) | |
| ) | |
| TRAVIS BENTON JOHNSON and ) | Case No. 07-51275 |
| AMY TURTLE JOHNSON, ) | |
| ) | |
| Debtors. ) | |
| _____) | |

**PARTIES IN INTEREST**

Travis and Amy Johnson

Thomas W. Anderson, Esquire

Christy C. Snow, Creditor

A. Carl Penney, Esquire

Kathryn L. Bringle, Chapter 13 Trustee

14